IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

The Estate of William Overbey,   :
    et al.,

       Plaintiffs,      :    Case No. 2:13-cv-0671

    v.                 :

The Licking County, Ohio,    :    Magistrate Judge Kemp
    Sheriff Randy Thorp, et al.,

       Defendants.    :


OPINION AND ORDER

    On July 12, 2011, while being held in the Licking County
Jail, William Overbey committed suicide by jumping off a second-
story walkway.  His estate and his surviving spouse, Christina
Overbey, filed this civil action against Licking County Sheriff
Randy Thorp, Licking County itself, and Tanner Vogelmeier, a
deputy sheriff who was on duty when Mr. Overbey died.  Plaintiffs
assert that each defendant is legally responsible for Mr.
Overbey's death.  The case has been referred to the Magistrate
Judge for all purposes with the consent of the parties, and is
currently set for trial on June 1, 2015.

    On January 14, 2015, all defendants moved for summary
judgment.  (Doc. 49).  Under Local Civil Rule 7.2(a)(2),
Plaintiffs were required to respond on or before February 9,
2015.  They did not.  Rather, they filed a motion for an
extension of time to respond on February 12, 2015, but because
they did not solicit the consent of the defendants to the
extension (something required by Local Civil Rule 7.3), the
motion was denied without prejudice.  Two days afterward, they
filed, without leave of Court, their response, which, by then,
was eleven days late.  Those circumstances led Defendants to file
a motion to strike the  response in opposition to the motion for

summary judgment.  (Doc. 55).  Both the motion for summary judgment and the motion to strike have been fully briefed.  For the reasons set forth below, the motion to strike Plaintiffs' response in opposition to the motion for summary judgment will be denied, and the motion for summary judgment will be granted.

## I.   The Motion to Strike

Before discussing the merits of the summary judgment motion, the Court takes a brief moment to resolve the motion to strike. Everyone agrees that Plaintiffs' opposing memorandum was not filed on time.  Plaintiffs argue that they miscalculated their response time by referring to the Local Civil Rules for the Northern District of Ohio, and they ask the Court to excuse their failure so that the case can be decided on its merits.

This Court has substantial discretion to excuse a late filing.  Without commenting on whether Plaintiffs' deviance from the time frames and procedures set out in Local Civil Rule 7.3 constitutes excusable neglect, which, under Fed.R.Civ.P. 6(b), may justify a late filing, the Court agrees that it is better to resolve this matter based on briefing from both parties, especially since the short delay in filing Plaintiffs' brief did not prejudice the Defendants.  Even if the response were stricken, the Court could not grant the summary judgment motion just because it stood unopposed.  Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991)(pursuant to Fed.R.Civ.P. 56, "a party moving for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact" and "the movant must always bear this initial burden regardless if an adverse party fails to respond").  For these reasons, the motion to strike will be denied, and the Court will consider Plaintiffs' arguments about why summary judgment is inappropriate here.

## II. The Facts

2

The following facts appear either in the complaint or other documents of record. Because the case is before the Court by way of summary judgment motion, the Court will, as explained in Section III, resolve any factual disputes in Plaintiffs' favor when stating the material facts of the case (although there are very few, if any, facts in dispute).

On July 12, 2011, Mr. Overbey was in the Licking County Justice Center as a pretrial detainee (that is, he had not been convicted of a crime, but was awaiting further proceedings in his criminal case). While working in B-module where Mr. Overbey was housed that morning, Deputy Timothy Sloane had a conversation with Mr. Overbey which led him to conclude that Mr. Overbey was upset. Mr. Overbey remarked to Deputy Sloane that "things were falling apart," and he explained that "he hadn't had a chance to speak with his attorney and he was coming up on a trial date, and he was also upset because he hadn't had a chance to communicate with his wife." (Sloane Deposition, Doc. 48, at 14-15). Based on the conversation, Deputy Sloane placed Mr. Overbey on "potential suicide risk," which is also known as SR-P.

Potential suicide risk is one of three levels of suicide prevention and intervention described in an American Correctional Association ("ACA") policy which has been adopted by the Licking County Justice Center. The three levels of suicide prevention and intervention listed in that policy are potential suicide risk, active suicide risk, and active suicide risk placed in isolation. The policy relevant to potential suicide risk states:

> Inmates booked into the facility who are upset, have a
> previous history of suicide attempts or are deemed to be
> a potential suicide risk will be placed on this level of
> suicide watch. The module officer will monitor the
> individual on a 10-minute irregular schedule (i.e., 8
> min, 6 min., 10 min., etc.). There will be no more than
> 10 minutes between checks. This will be a visual check
> of the individual to make sure there are no problems
> occurring. The status of the individual will be

3

> documented on the Suicide Risk log. All non-prescription medications will be removed from the inmate's cell/locker and placed in the module officer's closet/bathroom. The officer will dispense the medication in the allotted amounts per the instructions provided with each medication. If the potentially suicidal inmate is placed in isolation, the constant, continuous, uninterrupted observation is required.

(Doc. 49, Ex. 3. at 5).

After placing Mr. Overbey on potential suicide risk, Deputy Sloane contacted a mental health worker. He did so because, as he testified in his deposition, "[a]nyone placed on suicide risk will be seeing a mental health professional in order to get removed from the risk or to be evaluated to be maintained on the risk." (Doc. 48 at 20). Andy Santos, a mental health social worker, met with Mr. Overbey later that day.

At 7:00 p.m., Deputy Tanner Vogelmeier began his shift at the Licking County Justice Center. Although Deputy Vogelmeier was not scheduled to work in the facility that day, he covered the shift for Deputy Wayne Moore, who had to leave work early due to a family emergency. At the start of his shift, Deputy Vogelmeier learned that Mr. Overbey was on potential suicide risk and that an individual from the facility's mental health office had met with Mr. Overbey earlier that day. Deputy Vogelmeier began monitoring B-module approximately forty minutes into his shift, after assisting with "med pass," during which the jail nurse dispenses medication to the inmates who require it.

When Deputy Vogelmeier finished assisting with med pass, Mr. Overbey had just arrived back to B-module after a visit with his son, Jacob Overbey. That visit lasted approximately thirty minutes. During the visit, Mr. Overbey told his son that he had been placed "on suicide watch because he was sitting in his cell crying all day...." (Jacob Overbey deposition, Doc. 46, at 11). Jacob also testified that he did not think his father would

4

actually commit suicide, and he did not communicate any concerns about his father's mental health or safety to jail officials. While in B-module, Deputy Vogelmeier monitored Mr. Overbey visually in increments of ten minutes or less, as required by the ACA policy, and recorded Mr. Overbey's status on a suicide risk log.

B-module has an upper level which is approximately ten to twelve feet above its lower level. At approximately 8:40 p.m., Mr. Overbey was on the upper level of B-module and was talking to another inmate, Michael Goler, who was on the telephone with Jacob. Deputy Vogelmeier walked up the steps from the lower level to the upper level in order to speak with Mr. Overbey. As Deputy Vogelmeier reached the top of the steps, he was stopped by inmates in the upper level day room, one of whom told Deputy Vogelmeier that Mr. Overbey was having a rough time. During that conversation Deputy Vogelmeier could see Mr. Overbey in his peripheral vision. He noticed that Mr. Overbey started to lean forward, head first, over the metal railing. As Mr. Overbey started to go over the railing, Deputy Vogelmeier heard Mr. Goler yell "no." (Doc. 47 at 83). Deputy Vogelmeier ran toward Mr. Overbey in an effort to grab onto his legs. That effort was unsuccessful; Mr. Overbey went over the railing and hit the floor of the lower level of B-module head-first.

Deputy Vogelmeier immediately directed everyone to "lock down" because of the emergency situation, which prompted all of the inmates to return to their cells. As he was coming down the steps, Deputy Vogelmeier used his portable cordless phone to do a "medical all call" and then dialed the central office to get a squad and a med flight on standby. When Deputy Vogelmeier reached Mr. Overbey, he used his hands to hold Mr. Overbey's head still while the rest of Mr. Overbey's body was shaking. Deputy Vogelmeier attempted to talk to Mr. Overbey, but Mr. Overbey did

5

not respond.  Roughly one minute later, Mr. Overbey stopped
shaking and also stopped breathing.  Deputy Vogelmeier started
CPR, giving Mr. Vogelmeier chest compressions and two rescue
breaths using a mask provided to him by Corrections Officer
Engle, who had arrived on the scene from another floor.
Corrections Officer Engle relieved Deputy Vogelmeier on chest
compressions.  Shortly thereafter, a nurse arrived and relieved
Corrections Officer Engle, continuing to administer CPR.  When
the emergency squad arrived, Deputy Vogelmeier told the
paramedics what had happened, and they took over in attending to
Mr. Overbey's medical needs.  Mr. Overbey was transported to
Licking Memorial Hospital where he was pronounced dead as a
result of his injuries.  The key events were captured on the
jail's surveillance video.

### III. Summary Judgment Standard

Summary judgment is not a substitute for a trial when facts
material to the Court's ultimate resolution of the case are in
dispute.  It may be rendered only when appropriate evidentiary
materials, as described in Fed. R. Civ. P. 56(c), demonstrate the
absence of a material factual dispute and the moving party is
entitled to judgment as a matter of law.  Poller v. Columbia
Broad. Sys., Inc., 368 U.S. 464 (1962).  The moving party bears
the burden of demonstrating that no material facts are in
dispute, and the evidence submitted must be viewed in the light
most favorable to the nonmoving party.  Adickes v. S.H. Kress &
Co., 398 U.S. 144 (1970).  "[I]f the evidence is insufficient to
reasonably support a jury verdict in favor of the nonmoving
party, the motion for summary judgment will be granted."  Cox v.
Kentucky Dept. of Transp., 53 F.3d 146, 150 (6th Cir.
1995)(citation omitted).  Additionally, the Court must draw all
reasonable inferences from that evidence in favor of the
nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654

6

(1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion. It is with these standards in mind that the instant motion must be decided.

## IV. Discussion

Plaintiffs have brought both federal and state law claims relating to Mr. Overbey's suicide while incarcerated as a pretrial detainee in the Licking County Justice Center. While Plaintiffs state in their complaint that their federal claims arise under 42 U.S.C. §§1983, 1986 and 1988, the briefing on the federal claims refers only to §1983. 42 U.S.C. §1986 imposes liability on persons who are aware of and can prevent violations of 42 U.S.C. §1985, which prohibits certain civil rights conspiracies. In order to show a violation of §1986, the plaintiff must prove a valid claim under 42 U.S.C. §1985. See, e.g., Radvansky v. City of Olmstead Falls, 395 F.3d 291, 314-15 (6th Cir. 2005). Plaintiffs have not pleaded a §1985 claim and, in any event, as the Court later concludes, they have not produced sufficient evidence of any constitutional violation to permit this case to go to the jury, so an extended discussion of

§1986 is unnecessary. 42 U.S.C. §1988 provides for an award of attorney's fees to prevailing parties (usually plaintiffs). Because summary judgment will be entered in favor of Defendants, 42 U.S.C. §1988 does not come into play here either. Consequently, the Court will analyze the federal law issue by deciding if there are triable issues of fact on the §1983 claim.

### A. Deliberate Indifference Under 42 U.S.C. §1983

Plaintiffs assert claims under 42 U.S.C. §1983 for deliberate indifference to Mr. Overbey's medical and psychological needs. That statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

In order to state a claim under 42 U.S.C. §1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." Salehpour v. University of Tenn., 159 F.3d 199, 206 (6th Cir. 1988)(internal quotations and citations omitted). The status of each of the defendants as a "person acting under color of state law" is not disputed. Consequently, the key issue is whether, under the facts set forth above, a reasonable jury could find that Mr. Overbey's constitutional rights were violated in connection with his death.

In this case, Plaintiffs' claim is rooted in a prisoner's Eighth Amendment right to be free from cruel and unusual punishment. Although the Eighth Amendment does not apply to pretrial detainees like Mr. Overbey, pretrial detainees are guaranteed the right to adequate medical and psychological

treatment through the due process clause of the Fourteenth Amendment. Watkins v. City of Battle Creek, 273 F.3d 682, 685–86 (6th Cir. 2001). In order to establish that a pretrial detainee has been deprived of the right to adequate medical treatment, he or she must demonstrate that "(1) 'the deprivation alleged [is], objectively, sufficiently serious' such that the inmate 'is incarcerated under conditions posing a substantial risk of serious harm'; and (2) the prison official subjectively demonstrates 'deliberate indifference to inmate health or safety.'" Grabow v. County of Macomb, 580 Fed. Appx. 300, 307 (6th Cir. Aug. 29, 2014), quoting Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed.2d 811 (1994) (alteration in original). Thus, the constitutional standard has both an objective and a subjective component, focusing not only on how serious the detainee's medical needs were, but also how the defendant or defendants understood those needs and what they did to address them. See Comstock v. McCrary, 273 F.3d 693, 702 (6th Cir. 2001).

The Court of Appeals has observed that, in the prisoner suicide context, "proof of a prisoner's psychological needs manifesting themselves in suicidal tendencies with 'a strong likelihood that he would attempt to take his own life' are sufficiently serious for purposes of the objective component." Galloway v. Anuszkiewicz, 2013 WL 1149679, at *3 (6th Cir. Mar. 21, 2013), quoting Gray v. City of Detroit, 399 F.3d 612, 616 (6th Cir. 2005). As to the subjective component, a plaintiff must demonstrate that "'the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" Phillips v. Roane Cnty., Tenn., 534 F.3d 531, 540 (6th Cir. 2008), quoting Comstock, 273 F.3d at 703. In this context, the proper inquiry is whether "the

9

decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to a deliberate indifference to the decedent's serious medical needs." Gray, 399 F.3d at 616.

Recently, the Court of Appeals discussed its deliberate indifference jurisprudence in the prison suicide context, stating:

> we have held that a plaintiff demonstrated deliberate indifference sufficient to overcome a motion for summary judgment when, for example: (1) the prison official who placed the inmate on suicide watch failed to review medical records and psychological tests administered to an inmate, did not speak to officers who arranged psychological consults for an inmate or observed the inmate on a daily basis, did not speak with psychologists who previously met with an inmate, and only asked the inmate a few cursory questions before removing inmate from observation, Comstock, 273 F.3d at 707-10; (2) a prison official had actual knowledge of an inmate's past suicide attempts, knew the inmate's suicidal tendencies were provoked by his kidney conditions, and ignored the inmate's crying, complaints of kidney pain, and other suicidal gestures on the night of his death, Schultz v. Sillman, 148 Fed. Appx. 396, 401-03 (6th Cir. 2005); and (3) a prison official moved an inmate from suicide watch even though the official knew the inmate threatened and attempted suicide on several occasions within the same month in the jail and had previously been placed on behavior and suicide watches during multiple prior incarcerations at the same jail, Perez, 466 F.3d at 424-26.
>
> On the other hand, we have held that the plaintiff failed to overcome a motion for summary judgment when the plaintiff only demonstrated, for example that (1) the inmate yelled, destroyed items in his cell, had chest pain, and banged on his cell, but no single prison official observed all of these actions, Gray, 399 F.3d at 616-16; and (2) the inmate's behavior prompted the prison psychologist to issue a suicide precautions blanket and order observations every fifteen minutes, but the psychologist failed to take the additional precaution of directly warning the jail staff that the inmate might be suicidal, Galloway, 518 Fed. Appx. at 331-35.

Grabow, 580 Fed. Appx. at 308-09.  Under the relevant law, "[p]rison officials need only take reasonable precautions to prevent inmate suicide; they do not insure or guarantee the life of a prisoner." Galloway, 2013 WL 1149679, at *5.  Thus, even if a prison official was aware of a serious suicide risk, that prison official may be free from liability if he "'responded reasonably to the risk, even if the harm ultimately was not averted.'"  Comstock, 273 F.3d at 706, quoting Farmer, 511 U.S. at 844.

In this case, Defendants concede that Mr. Overbey's psychological needs were sufficiently serious to satisfy the objective component of the deliberate indifference standard. Indeed, Deputy Sloane placed Mr. Overbey on potential suicide risk based on his belief that Mr. Overbey's psychological condition might lead him to have suicidal thoughts (although he never expressed them) and that there was at least a possibility that Mr. Overbey might attempt to take his own life.  From these facts, a jury could find that Mr. Overbey had a serious medical need which required some attention from jail officials. Consequently, the focus here is not on what the Defendants knew or when they knew it; it is on what they did in response to that knowledge.  The Court will address that question first with respect to Deputy Vogelmeier.

### 1. Deputy Vogelmeier

The only one of the defendants who dealt directly with Mr. Overbey on the day in question was Deputy Vogelmeier.  His state of mind is directly at issue here.  As the law cited above requires, the Court must determine if a jury could find these things about his state of mind: (1) he subjectively perceived (that is, he knew) facts which suggested that Mr. Overbey was at risk of harm; (2) he actually drew that inference (that is, he not only knew the facts which put Mr. Overbey at risk, but he

11

also believed that Mr. Overbey was at risk); and (3) he consciously and deliberately disregarded the risk of harm that he knew about, leading to Mr. Overbey's death. Again, all parties agree that Deputy Vogelmeier became aware at the start of his shift on July 12, 2011, that Mr. Overbey had been placed on suicide risk, so a jury could easily find that he knew enough facts to put a reasonable person on notice that some level of suicide potential existed. Additionally, there does not seem to be much dispute about whether he understood the significance of those facts - he knew that Mr. Overbey had already been classed as a suicide risk, and his conduct on the day in question reflect that knowledge. Thus, the crucial issue is whether Deputy Vogelmeier disregarded that risk in a way that would make him liable - or, more properly put, since the Court is ruling on a summary judgment motion, whether a jury could reach that conclusion.

In their motion for summary judgment, Defendants argue that "Deputy Vogelmeier did nothing unreasonable, let alone reckless, with respect to Overbey's medical and/or psychological needs." (Doc. 49 at 11). Defendants point to the following in support of their position:

> Overbey was placed on potential suicide risk by the previous shift. Mental health met with and evaluated Overbey. Upon arriving in B-module, Vogelmeier spent the brief time before Overbey left for visitation monitoring Overbey and assisting with med pass. After visitation, Vogelmeier continued to monitor Overbey and was on his way to talk with him when Overbey jumped to his death. Prior to this, Vogelmeier did not observe anything unusual with Overbey to cause him concern.

Id. (internal citations omitted). In opposing the motion for summary judgment, Plaintiffs do not really take issue with this summary of the facts, but they argue that Deputy Vogelmeier disregarded the risk of suicide because he did not have Mr.

Overbey seen and treated by a medical professional and he permitted him to walk freely to the upper level of B-module where there was no protective netting. In their reply, Defendants assert that Deputy Vogelmeier complied with the ACA policy which allowed Mr. Overbey to walk freely without physical restriction. They also point out that Mr. Overbey was seen and evaluated by a mental health professional, social worker Andy Santos, after he was placed on potential suicide risk, and that he was scheduled to be evaluated by the jail doctor the following day.

As noted previously in this Opinion and Order, potential suicide risk is one of three levels of suicide prevention and intervention described in the ACA policy adopted by the Licking County Justice Center. Potential suicide risk is the lowest level of suicide prevention and intervention in that policy, and inmates are placed on that level if they are upset, have a previous history of suicide attempts, or are deemed to be a potential suicide risk. Corrections officials are instructed to deal with this level of risk by monitoring the person visually in increments of no more than 10 minutes and noting the individual's status on a suicide risk log. In addition, all non-prescription medications are to be removed from the individual's cell. In this case, there is no dispute that Deputy Vogelmeier complied with the ACA policy.

In arguing that Deputy Vogelmeier was deliberately indifferent to Mr. Overbey's medical or psychological needs because he allowed Mr. Overbey to walk freely without restriction, Plaintiffs are, in essence, arguing that following the ACA policy for potential suicide risk to the letter constituted deliberate indifference to Mr Overbey's constitutional right to receive adequate care, including suicide prevention measures. This Court disagrees, and finds that no reasonable jury could reach that conclusion. At the time that

13

Mr. Overbey was placed on potential suicide risk, he had not expressed an intent to harm himself, nor had he taken any affirmative steps toward suicide. Further, Deputy Vogelmeier was aware only that the jail officials who dealt with Mr. Overbey earlier that day had deemed him to be at the lowest level of risk for suicide, and there are no facts from which a jury could conclude that Deputy Vogelmeier should have raised the risk level himself or instituted additional precautions. Plaintiffs do not point to any facts which, either under the ACA policy or otherwise, were both known to Deputy Vogelmeier and which pointed to the existence of a more significant risk to Mr. Overbey. To say that deliberate indifference existed in these circumstances would be to say that everyone deemed to be at the lowest level of suicide risk must be either confined to a cell or restricted to an area of a jail where there is no possibility that the person could suddenly decide to harm himself. Perhaps those measures would be "best practices" (or perhaps not - but that is not the question here), but the Constitution does not require them.

Plaintiffs also argue that Deputy Vogelmeier disregarded the risk that Mr. Overbey might commit suicide by not having him examined immediately by the jail physician or psychiatrist. However, there is no evidence in the record to support that claim. Deputy Vogelmeier knew that Mr. Overbey had already been examined by a mental health social worker and that he was scheduled to meet with the facility's doctor the following day. During the time when Deputy Vogelmeier was observing Mr. Overbey, nothing occurred which would have led a jail official to believe that an immediate referral to a doctor was either necessary or advisable. Again, a reasonable jury could not find Deputy Vogelmeier liable for failing to accelerate that process. Nothing about his observations, or the undisputed facts about Mr. Overbey's behavior, suggested that if he were not immediately

14

taken to the doctor - and, for purposes of this case, that means within the first 40 minutes of Deputy Vogelmeier's shift - he would harm himself.

Were there things which could have been done differently? Certainly, in hindsight, it would appear that everyone, including Deputy Vogelmeier, wishes that Mr. Overbey's suicide had not occurred. Did the suicide occur as a result of Deputy Vogelmeier's failure to take reasonable steps to monitor Mr. Overbey, consistent with the level of risk which Deputy Vogelmeier actually understood to exist? A jury could not find that. He is therefore entitled to summary judgment on the claim under 42 U.S.C. §1983.

### 2. Sheriff Thorp

The Court now turns to the allegations against Sheriff Thorp. Plaintiffs do not mention Sheriff Thorp specifically in their opposition to the summary judgment motion, nor have they contradicted Sheriff Thorp's sworn statement that he had no personal involvement with Mr. Overbey on the day in question. As Defendants point out, "liability under §1983 must be based on active unconstitutional behavior and cannot be based upon a 'mere failure to act.'" Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999), quoting Salehpour v. University of Tennessee, 159 F.3d 199, 206 (6th Cir. 1998). In other words a supervisory official who did not participate directly in an alleged constitutional violation may be held liable under 42 U.S.C. §1983 only in very specific situations, and simply being the supervisor of a person who has committed a constitutional violation is not one of them. See Monell v. Department of Soc. Servs., 436 U.S. 658 (1978); Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984).

It is true that a supervisor's failure adequately to train a subordinate officer appropriately may be a valid theory of

liability under §1983. See, e.g., Phillips v. Roane Cnty., Tenn., 534 F.3d 531, 543 (6th Cir. 2008). The Court examines that claim below. To the extent that Plaintiffs claim that Sheriff Thorp acted with deliberate indifference to Mr. Overbey's serious medical or psychological needs based upon any direct involvement with Mr. Overbey, however, there is simply no evidence of that, and the Court will grant Sheriff Thorp summary judgment on that claim.

### B. Failure To Train

Since the Supreme Court's decision in Monell v. Department of Social Services, 436 U.S. 658 (1978), municipal governmental bodies such as cities and counties are considered to be "persons" who can be sued under 42 U.S.C. §1983. However, Monell made clear that a municipality cannot be held liable under that statute simply because it employed an individual who violated the plaintiff's constitutional rights. Rather, the plaintiff must prove that the individual's actions can legitimately be viewed as the actions (or the direct result of actions) of the county itself.

In decisions handed down after Monell, the Supreme Court outlined several ways in which a plaintiff can prove municipal liability under §1983. One of the most common methods is to show that the municipality had a policy or practice of failing to give adequate training to its employees about how to behave in situations they are likely to encounter. If those untrained employees then violate the constitution in such a situation, it may fairly be said that the cause of that violation was the county's failure to train its employees to do otherwise. See, e.g., City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989).

However, not just any failure to train will do. As the Harris court observed, "it may happen that in light of the duties assigned to specific officers ... the need for more or different

16

training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [county] can reasonably have been said to have been deliberately indifferent to the need." If that is so, "the failure to provide proper training may fairly be said to represent a policy for which the [county] is responsible, and for which the [county] may be held liable if it actually causes injury." Id. at 390 (footnotes omitted). For liability to attach under this theory, the plaintiff must also prove that "the identified deficiency in a [county]'s training program [is] closely related to the ultimate injury." Id. at 391. Further, it is important to keep in mind that even if "a particular officer may be unsatisfactorily trained, [that fact] will not alone suffice to fasten liability on the [county]" and that the negligent administration of "an otherwise sound program" is not a basis for §1983 liability. Finally, the Harris court pointed out, and it is worth remembering, that "adequately trained officers occasionally make mistakes, [and] the fact that they do says little about the training program or the legal basis for holding the [county] liable." Id.

In addition to a failure-to-train claim asserted against a municipality, a plaintiff may also bring a failure-to-train claim against a supervisor in his individual capacity or in his official capacity. As the Court of Appeals has stated:

> For individual liability on a failure-to-train or supervise theory, the defendant supervisor must be found to have "'encouraged the specific incident of misconduct or in some other way directly participated in it.'" Phillips v. Roane Cty., 534 F.3d 531, 543 (6th Cir. 2008), quoting Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999). A plaintiff must demonstrate that the defendant supervisor "'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." Id. (quoting Shehee, 199 F.3d at 300). A mere failure to act will not suffice to establish supervisory liability. Gregory v. City of

17

<u>Louisville</u>, 444 F.3d 725, 751 (6th Cir. 2006).

<u>Essex v. County of Livingston</u>, 2013 WL 1196894, at *3 (6th Cir. Mar. 25, 2013).  Thus, for an individual capacity claim to succeed, a plaintiff must prove that it was the "defendant supervisor's active engagement in a function of [his] position" that resulted in the injury.  <u>Id</u>.  In contrast, a failure-to-train claim against a supervisor in his official capacity arises when a defendant supervisor acts with deliberate indifference in his position as a policymaker.  <u>Phillips</u>, 534 F.3d at 543. Official capacity claims "do not require direct participation in or encouragement of the specific acts; rather, these claims may be premised on a failure to act."  <u>Essex</u>, 2013 WL 1196894, at *4.

Defendants' summary judgment motion sets forth several reasons why, in their view, Plaintiffs cannot prove a supervisory liability claim against either Sheriff Thorp or Licking County. Specifically, Defendants argue:

> First, there is no failure-to-train theory because none of the individual Defendants (Vogelmeier) are liable for violating Overbey's constitutional rights.  Second, in light of the record in this case, Plaintiff (sic) cannot identify a need for training that was so inadequate, and so likely to result in a violation of an inmate placed on suicide watch's civil rights, that any of the Defendants could be found to have been deliberately indifferent.

(Doc. 49 at 12).  Defendants argue that Plaintiffs have failed to produce any evidence demonstrating that any corrections officer or deputy was unfamiliar with the applicable ACA policy or failed to follow the applicable policy.  Thus, Defendants claim that "[t]here was no inadequacy of training, let alone an inadequacy that was so glaring to be a constitutional violation."  <u>Id</u>. at 13.

Plaintiffs make a brief argument in opposition to the motion for summary judgment on their failure-to-train theory. Plaintiffs' argument, in its totality, states:

18

> Vogelmeier admitted that he had no suicide training (Vogelmeier Dep. Tr. 12-21), that he was called in from the road to replace the regularly scheduled deputy inside the jail, and that he is more of a drug agent than a correction officer. (Vogelmeier Dep. Tr. 103-104). The jail had 2 prior suicides in 90 days. Vogelmeier also admitted he did not speak to Overbey when Vogelmeier came on shift and before Overbey committed suicide. (Vogelmeier Dep. Tr. 56). A jury could conclude that the failure to train its jail personnel amounted to a constitutional violation (deliberate indifference), and Vogelmeier's lack of training caused Overbey's suicide. See Grose v. Caruso, 284 Fed. Appx. 279; Lupo v. Voinovich, 235 F. Supp.3d 782, 794 n.8 (S.D. Ohio 2002). Therefore, this Court should leave this issue for a jury to decide.

(Doc. 54 at 8-9). In reply, Defendants reiterate the arguments set forth in the motion and also refer the Court to Deputy Vogelmeier's affidavit. In his affidavit, Deputy Vogelmeier explains that he received two forms of training on suicide detection and prevention, first at the Jail Academy after he was hired in 2008 and, second, at least once per year as in-service training.

Based on this evidence, this Court finds that no reasonable jury could conclude that the need for more or different training was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that Licking County or Sheriff Thorp could reasonably be said to have been deliberately indifferent to the need for training on suicide prevention. Plaintiffs have not produced any evidence from which a jury could infer that any alleged deficiency in Licking County's training of Deputy Vogelmeier, or any of its deputies, was closely related to Mr. Overbey's suicide - that is, that more or different training would have changed what Deputy Vogelmeier or others did on the day in question. But perhaps most importantly, the Court is granting summary judgment on the issue of whether any

constitutional violation occurred; since that issue is being resolved in Defendants' favor, there can be no municipal liability on a failure to train claim. See Ewolski v. City of Brunswick, 287 F.3d 492, 516 (6th Cir. 2002)("Where ... a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm"). Thus, all of the defendants are entitled to summary judgment on all of the federal law claims.

C. Wrongful Death and Survivorship

Although Ohio law provides civil remedies for wrongful death and survivorship, see, e.g., In re Heparin Prods. Liab. Litig., 2011 WL 3875361, at *4 (N.D. Ohio Sept. 1, 2011), it also provides both Licking County and its employees broad statutory immunity from such claims. The immunity granted to Licking County arises under O.R.C. §2744, and it is subject to just five exceptions. Defendants correctly argue that none of those exceptions apply in this case. Defendants explain:

> This case does not concern a motor vehicle, a public road, or any grounds or buildings, and this [sic] R.C. 2744.02(B)(1), (3) and (4) are inapposite. R.C. 2744.02(B)(2) does not apply because the operation of a jail a [sic] governmental, rather than proprietary, function. See Hiles v. Franklin County Bd. Comm'rs, Franklin App. 05AP-253, 2006-Ohio-16, ¶34 (citing R.C. 2744.01(C)(2)(h) and Busscio v. McFaul (Aug. 2, 2001), Cuyahoga App. No. 78758, 2001 Ohio App. LEXIS 3407. And lastly, there is no provision in the Ohio Revised Code that imposes liability on Licking County under these circumstances. See R.C. 2744.02(B)(5).

(Doc. 49 at 18-19). For these reasons, Licking County is immune from Plaintiffs' claims for wrongful death and survivorship.

Similarly, O.R.C. §2744.03(A) provides employees of a political subdivision statutory immunity from lawsuits seeking "to recover damages for injury, death, or loss to person or

property allegedly caused by an act or omission in connection
with a government or proprietary function...."  As noted above,
the operation of the Licking County Justice Center is a
governmental function.  O.R.C. §2744.01(C)(2)(h).  Consequently,
its employees are entitled to sovereign immunity unless:

> (a) The employee's actions or omissions were manifestly
> outside the scope of the employee's employment or the
> employee's official responsibilities;
>
> (b) The employee's acts or omissions were with malicious
> purpose, in bad faith, or in a wanton or reckless manner;
> [or]
>
> (c) Civil liability is expressly imposed upon the
> employee by a section of the Revised Code.

O.R.C. §2744.03(A)(6)(a)-(c).  The first and third of these
exceptions do not apply to the facts of this case.  Thus, in
resolving the individual defendants' motion for summary judgment
on this claim, the Court must decide whether a jury could find
that either of them acted in a wanton or reckless manner.  See
Rankin v. Cuyahoga Cty. Dep't. of Children and Family Servs., 118
Ohio St.3d 392, 397 (2008).  In arguing that a jury could so
find, Plaintiffs rely on the arguments they made in support of
their §1983 claim.

First, as to Sheriff Thorp, his sworn statement reflects
that he had no personal involvement with Mr. Overbey, so he could
not have acted with the necessary wanton or reckless state of
mind to void his immunity under state law.  As to Deputy
Vogelmeier, the Court has found that a jury could not conclude,
based on these facts, that he exhibited deliberate indifference
to Mr. Overbey's serious medical needs.  For the same reasons, a
jury could not find that his behavior was wanton or reckless as
those terms are defined in Ohio law.  The Court of Appeals has
suggested, in fact, that "the threshold for liability appears to
be slightly higher under Ohio law" than the "deliberate

indifference" threshold for liability under §1983.  <u>Stefan v. Olson</u>, 497 Fed. Appx. 568, 581 (6th Cir. Aug. 31, 2012); <u>see also Ruiz Bueno v. Scott</u>, 2014 WL 5308615, *20 (S.D. Ohio Oct. 16, 2014)(holding that the absence of a genuine issue of material fact as to federally-based deliberate indifference claims also warrants summary judgment on the issue of state law immunity). Therefore, statutory immunity applies to his actions as well. Consequently, Defendants' motion for summary judgment as to the state law claims will be granted.

### D. <u>Spoliation of Evidence</u>

Defendants have also moved for summary judgment on a state law claim for spoliation of evidence.  In their response, Plaintiffs state that they "do not challenge Defendants' Motion Summary Judgment [sic] as it relates to the spoliation claim." (Doc. 54 at n.3).  For that reason, and because there is no evidence in the record to support that claim, that portion of the motion for summary judgment will be granted as well.

### V. <u>Conclusion</u>

Jail suicide cases are almost uniformly tragic.  Sometimes, jail officials do not live up to their duty to take appropriate measures to prevent a jail inmate from committing suicide.  When that happens, they are properly held liable.  But the facts of this case tell a different story.  Here, jail officials took Mr. Overbey's situation seriously, giving him access to a mental health social worker, putting him on an acceptable level of suicide watch, scheduling him to see a doctor, and monitoring his movements at least every ten minutes.  In particular, Deputy Vogelmeier followed ACA policy and was on his way to speak to Mr. Overbey when he jumped to his death.  Regrettable as that occurrence was, a jury could not reasonably find that Mr. Overbey's death resulted from a violation of his constitutional rights.  For all of the reasons set forth in this Opinion and

Order, Defendants' motion (Doc. 55) to strike Plaintiffs'
response in opposition to the motion for summary judgment is
denied and Defendants' motion for summary judgment (Doc. 49) is
granted.  The Clerk shall enter judgment in favor of the
Defendants and terminate this case.

                                    /s/ Terence P. Kemp
                                    United States Magistrate Judge